Filed 9/28/20  P. v. Pimentel CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL PIMENTEL,<br><br>Defendant and Appellant. | B301405<br><br>(Los Angeles County<br>Super. Ct. No. MA075212) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shannon Knight, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel Jr., and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Gabriel Pimentel sexually abused four young granddaughters at his home.  He was convicted by jury of nine counts of committing lewd and lascivious acts on children under the age of 14 and one count of continuous sexual abuse.  (Pen. Code, §§ 288, subd. (a), 288.5.)[1]  The 10 counts involved multiple victims; as a result, appellant was sentenced to consecutive terms in state prison of 25 years to life, for an aggregate term of 250 years to life.  (§ 667.61, subds. (e)(4), (j)(2).)

We conclude that substantial evidence supports the jury's continuous sexual abuse finding; there was no abuse of discretion in admitting evidence of uncharged sex offenses; the credibility of defense witnesses could be undermined with testimony about appellant's domestic abuse; appellant could be cross-examined about his claim that the prosecution witnesses were untruthful; and the "One Strike" law was properly imposed.  We affirm.

## FACTS AND PROCEDURAL HISTORY
### *Crimes Against L.C.*

L.C., born in 2006, is appellant's granddaughter.  She was 12 years old at trial.  L.C. stayed at appellant's home in Palmdale.  He slept on a mattress on the floor near L.C.

When L.C. was seven or eight years old, appellant called her to the bedroom while his wife was in the shower.  At his request, L.C. lay beside him on his bed.  He began rubbing her thigh over her clothing, then reached under her clothing and rubbed her private part.  This was the first time he touched L.C. in a way that made her feel uncomfortable.

When L.C.'s grandmother turned off the shower, appellant stopped rubbing L.C. and told her to go, saying "this is our little

---

[1]  Undesignated statutory references are to the Penal Code.

2

secret." L.C. worried "if I told anyone, I would get in big trouble." Because she felt a little afraid of appellant, she did not tell anyone that he touched her.

L.C. recalled a second incident when she was seven or eight and her grandmother was away shopping. Appellant told L.C. to get on the bed with him and "started immediately touching my private part" over her clothing. After a minute or two, L.C. made appellant stop by "making an excuse that I needed to use the restroom." L.C. feared appellant and did not tell anyone he touched her vagina. She drew circles on a diagram to show the area he touched.

L.C. was close to her grandparents. She is heartbroken that they no longer see her since she told detectives the truth.

In counts 1 and 2 of the information, appellant was charged with committing lewd and lascivious acts on L.C., a child under age 14. (§ 288, subd. (a).) He was convicted on both counts.

### Crimes Against S.C.

S.C., born in February 2009, is L.C.'s younger sister. She was 10 years old at trial. She often visited appellant and her grandmother and was close to them.

When S.C. was five, appellant touched her in a way that was uncomfortable while her grandmother was in the kitchen. Appellant was on the bed. He touched S.C.'s private part over her clothing with an upturned palm, opening and closing his fingers. Afterward, he told her not to tell anyone. She felt scared, "like something bad would happen."

When S.C. was nine, appellant called her and her younger sister A.C. into his bedroom and touched the private parts of both children. He touched S.C. in the same way as before. S.C. saw

3

him touch A.C.'s private part as well. The children were playing an electronic game on a tablet while appellant touched them.

S.C. went to the living room afterward and did not tell anyone that appellant touched her. Later, she spoke to detectives about it. She marked the vaginal area on a drawing to show where appellant touched her. No one told her to make up stories about appellant to get him in trouble.

In counts 3 and 4, appellant was charged with committing lewd and lascivious acts upon S.C., a child under age 14. (§ 288, subd. (a).) He was convicted on both counts.

### Crimes Against A.C.

Appellant's granddaughter A.C. was born in February 2011 and was eight at the time of trial. She used to visit him, and sometimes stayed overnight, with her sisters L.C. and S.C.

A.C. testified that when she was five or six years old, appellant "made me uncomfortable and upset." She was lying on the bed at his home while her grandmother was in the kitchen. Appellant lay down next to her, "told me not to tell anybody, and then he started touching my private part" over her clothing. She demonstrated how he opened and closed his thumb against her body. Appellant's conduct made A.C. feel uncomfortable, weird and confused. She did not tell anyone "because I was scared if he was going to do something to me."

After the initial incident, appellant touched A.C.'s private part "the same way" "a lot of times" and "a bunch of times" in the bedroom or living room. It happened "every time" she visited and they were alone. Once, he touched her and S.C. the same way while they played together. A.C. saw him touch S.C. A.C. drew a circle between the legs of a cartoon character to show where appellant touched her private part.

4

After A.C. spoke to her parents and detectives about appellant, she no longer sees her grandparents; they do not talk to her. She averred that she is telling the truth. No one asked her to make up stories about her grandfather to get him in trouble.

In counts 5, 6, and 7, appellant was charged with committing lewd acts upon A.C., a child under age 14, and continuous sexual abuse of a child with whom he resided or had recurring access. (§§ 288, subd. (a), 288.5.) He was convicted on all three counts.

### Crimes Against S.M.

S.M. is appellant's granddaughter, born in 2010. She was eight at trial. L.C., S.C., and A.C. are her cousins. S.M. was close to her grandparents and often visited them.

When S.M. was seven, appellant touched her three times in a way that made her feel uncomfortable. The first time, she was on the living room couch next to appellant; her siblings were in the same room, distracted by their telephones. She testified that appellant "told me to sit in his lap and he started touching me." He put her on his lap, facing away from him, and massaged inside her clothes, with his skin touching hers, on "the edge" of her vagina.

After "a little while" of rubbing, S.M. grabbed her phone and said something was wrong with it to distract appellant because "I didn't want to get touched." Appellant stopped. Later, at his request, "we went in his room and he told me to lay on the bed" with him. Appellant asked, "if I tell you a secret, will you tell anyone?" S.M. replied, "I will, yes." Appellant then asked if she wanted to rejoin her siblings in the living room and S.M. agreed because "I was uncomfortable." S.M. did not tell her

5

siblings or parents that appellant touched her "because I was too scared" appellant would "get mad."

The second time appellant touched S.M., she was in the backyard of his home; she, her siblings, and A.C. were playing in his swimming pool. S.M. left the pool and appellant asked her to sit in his lap on a chair. She stated, "so I sat on his lap and he started touching me in the same spot in the same way," by her private part. He touched her for three minutes. S.M. does not know if A.C., seated nearby, saw what was happening. S.M. did not tell anyone right after it happened.

In the third incident, S.M. and appellant were in the kitchen. Appellant asked her to approach, turned her to face away from him and began touching her in the spot near her private part. S.M. did not recall how long he touched her. He did not say anything during the incident. A few weeks after the last incident, S.M. decided to tell her mother what happened because "something was just telling me in my head to tell her, like, it's not good that he did that to you."

S.M. marked the area between the legs of a cartoon drawing to show where appellant touched her private part. No one asked her to make up stories about appellant to get him in trouble. She testified that she is telling the truth about him.

In counts 8, 9, and 10, appellant was charged with committing lewd and lascivious acts on S.M., a child under age 14. (§ 288, subd. (a).) He was convicted of all three counts.

### *Uncharged Sexual Propensity Evidence*

Appellant grew up in a large family, with 13 siblings. The court allowed appellant's sisters to testify—in descending order from older to younger—that he molested them when they were children.

6

Appellant's sister A.P. is 10 years younger than appellant. When A.P. was four or five years old, she awoke to find appellant's tongue in her mouth. He touched her sexually "several times per week, any opportunity he had." This occurred when they were alone or even right in front of or around the corner from other people. He grabbed and pretended to hug or tickle A.P. when others were present but was rubbing his erect penis on her from behind, and she could feel it. When they were alone, he was more aggressive, "everything from grabbing my vagina to sticking his hand down my pants, sticking his finger inside of me." Appellant would enter the bathroom while A.P. was showering and grope her buttocks and vagina.

A.P. did not tell her parents about appellant's behavior until she was much older. At the time it occurred, she was a child and was ashamed, scared, and disgusted. When she told appellant to stop touching her, he would say, "you know your boyfriend's going to do it when you're older. You're going to like it when you get older. What's the difference if I do it? Everybody does it." As she got older, he told her that their parents would kick them out of the house if she informed on him "and then he could do whatever he wanted to me." The abuse stopped after A.P. turned 11 and could fight off appellant.

A.P. tried to monitor younger siblings to protect them from appellant. When A.P. was 15, she overheard her seven- and 10-year-old sisters talking; she confronted them and they admitted "that they had both been molested" by appellant. After that, A.P. spoke to all siblings and warned them they had to protect each other from appellant. When A.P. eventually told her mother that appellant molested her for years, and five of her siblings as well,

7

her mother did not believe it and blamed A.P.  A.P. wants to stop appellant and has no reason to fabricate her testimony.

I.P. is a year younger than her sister A.P.  I.P. asked family members to leave the courtroom during her testimony because she feels "shame."  She testified that she was around age six when appellant sexually molested her in the family home.  "It happened several times a week" for years, in the bathroom.  He stopped when she was 10 or 11 and "he moved on to my sisters."

During these incidents, appellant and I.P. were fully disrobed.  She stated that appellant would turn her to face away from him, "put his penis against my anus and would fondle me from behind on my vagina."  The molestations would last a minimum of 10 minutes.  Sometimes, he made her kiss or lick his penis.  She felt she had to comply.  He would threaten her not to tell anybody, saying that their parents would be mad, or would hit her, or kick her out of the house.  On 20 to 30 occasions, appellant made her stroke his penis when they were in the back of the family station wagon.

Appellant's sister L.B. admitted being "very angry" because he raped her when she was a child.  He initially told her he wanted to touch her when she was seven or eight years old and kissed and caressed her in the family car.

L.B. recounted that when she was nine or 10 years old, appellant told her to go into the bathroom with him, over her objections.  She was "very scared" of appellant because he threatened her.  Appellant was naked.  He locked the bathroom door.  L.B. used the toilet and after she finished appellant licked her vagina and made her kiss his penis when she refused to put it in her mouth.  Around the same age, appellant rubbed L.B.'s

8

clitoris and inserted his finger in her vagina, under her panties, as she lay on a bed to take a nap.

When L.B. was 12, appellant raped her. He made their siblings leave the house and locked the door. He took L.B. to a back bedroom, bent her over and put his penis in her vagina. He had his hand over L.B.'s mouth so she would not scream. Afterward, L.B. told her younger sister what happened. L.B. can recall the most traumatic incidents involving appellant but has blocked out other incidents. L.B. went to appellant's home once, 20 years ago, because she wanted to make sure he was not molesting his daughters.

V.G.R., born in 1976, is the youngest of appellant's siblings. She testified that when she was six or seven, appellant picked her up from the home of an older sister and drove her to a dark parking lot; she remembers crying "and then I blacked out." When she was eight, appellant had her lie on top of him at the family home and pulled her up and down to create friction. V.G.R. remembered the incident in which appellant locked her outside the house while he stayed inside with L.B. for 10 or 15 minutes; afterward L.B. was crying and years later said appellant had raped her.

### Defense Evidence

Appellant's son Gabriel Pimentel, Jr. testified that L.C. has lived with appellant since she was two months old. Appellant slept on a mattress on the floor near L.C. S.C. and A.C. spent several hours at appellant's home "pretty much five days out of the week." Sometimes, they spent the night at appellant's home. Pimentel, Jr. never saw appellant act inappropriately.

Pimentel, Jr. works over 40 hours a week at his job and was at work while the victims were at appellant's home. Though

9

Pimentel, Jr. was not at the house 24 hours a day, he claimed that appellant, who retired more than 10 years ago, "never had the kids alone." Pimentel, Jr. is certain appellant is innocent even though his own young daughter, I.M., accused appellant of molesting her at age four. Pimentel, Jr. does not believe I.M. because there was no witness "or proof of her being touched." He is not on speaking terms with his sisters, the mothers of the victims in this case.

Appellant's oldest sister, Josefina Negrete, testified that her sisters did not tell her appellant molested them and she did not see him act inappropriately. She was married and left home at age 18, when L.B. was five years old. Negrete was not close to her sisters growing up or as an adult. She learned about the accusations against appellant from a cousin.

Appellant's wife Ofelia Pimentel testified that she never left the house without her husband and never left him alone with her granddaughters in the master bedroom. She spends a lot of time in the kitchen, only 10 steps from the bedroom. She has never seen appellant act inappropriately with the children. She has raised L.C. since the child was two months old. A.C. and S.C. came to her house "frequently," "almost on a daily basis."

Mrs. Pimentel knows her granddaughters accuse appellant of molesting them. She chose to believe appellant over his accusers. She never left the children alone with appellant. She does not know how to search the Internet and denied using a Gmail account associated with her home to search for prurient material about grandfathers molesting prepubescent granddaughters. She denied that appellant ever beat or abused her.

10

Appellant testified.  He denied touching his granddaughter I.M. inappropriately and was not charged with a crime.  He denied molesting his sister A.P., saying he was always in school or at work and rarely home "so I couldn't have done that."  He did not ask his sister I.P. to kiss or lick his penis because "there was no time for me to be around and to be doing stuff like that" and he never threatened her to stay silent.  He denied licking or touching L.B.'s vagina or raping her while covering her mouth to silence her.  He denied rubbing against his sister V.G.R. or touching her inappropriately.  He has a "very good" relationship with his daughters and grandchildren, who were at his house "all the time."

Appellant testified that his granddaughters are "not allowed to go in my bedroom" because he keeps medications and syringes there; however, he agreed his granddaughters sleep in his bedroom but he is never alone with them.  He slept on a mattress on the floor near his wife and L.C.  He denied touching his granddaughters on the vagina or telling them to keep it a secret.  He only hugged and kissed like a grandfather.

Appellant saw his granddaughters testify, and even cry in court, but accused them of lying that he touched their vaginas.  The testimony from his sisters about his molestations was "not true."  He has no idea why four sisters and four granddaughters would accuse him of molestation.

Appellant stays home since retiring from his construction job in 2005.  Since 2005, his wife "never" left the house without him and is "with me all the time."  He "never was alone with my grandkids."

Appellant uses a cell phone; his home has Internet with WiFi.  He knows how to search the Internet but denied searching

11

on Ofeliapim9@gmail.com for material about grandfathers having sex with six-year-old granddaughters. Appellant denied beating his wife or leaving her on a freeway shoulder at night.

### *Rebuttal Testimony*

On rebuttal, A.P. testified that Ofelia admitted appellant hit her, leaving bruises on her eye and a thick lip. Ofelia showed A.P. her neck and said appellant had choked her; further, he left Ofelia on the side of the 2 Freeway at night. Ofelia was "in tears" when she told A.P. that appellant "gets mad over nothing."

Appellant's daughter, E.M., testified that she left S.M. alone with appellant twice a week while driving her mother, Ofelia, to do errands. She recalled that appellant "choked my mom" and was verbally abusive to Ofelia. She helped appellant set up the Google account Ofeliapim9@gmail.com.

The investigating detective testified that she authored a search warrant for appellant's Google account. Google supplied information showing that searches for grandfather/grandchild pornography were made from appellant's home in 2017.

## DISCUSSION

### *1. Evidence Supporting the Section 288.5 Conviction*

Appellant contends that "the evidence was insufficient to establish the continuous sexual abuse of [A.C.], Count 7, lasted at least three months as required pursuant to section 288.5."[2] We

---

[2] The statute criminalizes sexual abuse by "Any person who resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense . . . or three or more acts of lewd and lascivious conduct, as defined in Section 288,

12

review a challenge to the sufficiency of the evidence by examining the record in the light most favorable to the judgment, looking for reasonable, credible evidence that would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.  (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)  We presume " 'the existence of every fact the trier could reasonably deduce from the evidence.' "  (*Ibid.*)

The jury found that appellant engaged in three or more lewd and lascivious acts with A.C., when he resided with or had recurring access to her from February 6, 2017, to October 19, 2017.  We conclude that substantial evidence supports the finding.

A.C. was born in February 2011.  She testified that appellant first molested her when she was five or six years old, which would fall between February 2016 and February 2018.  The last molestation of A.C. occurred on a day when S.C. was simultaneously molested.  A few weeks later, in November 2018, S.C. spoke to her mother and detectives about the abuse.  The molestations of A.C. may have started as early as February 2016 (when A.C. turned five); even using a February 2017 starting date, many months lie between then and November 2018, far more than the minimum of three months specified in section 288.5.

A.C. described the first molestation with specificity.  It occurred in the bedroom while her grandmother was in the kitchen; appellant told her "not to tell anybody"; she showed the jurors how he rubbed his thumb against her "private part"; she felt uncomfortable, weird, confused, and scared.  Later, A.C.

with a child under the age of 14 years at the time of the commission of the offense."  (§ 288.5, subd. (a).)

13

made the same back-and-forth motion to show how appellant touched her private part in the last molestation. A.C. said the "private part" is between the legs. A.C. described "the kind of act or acts committed with sufficient specificity" to enable the jury to determine that lewd conduct occurred. (*People v. Jones* (1990) 51 Cal.3d 294, 316, italics omitted.)

A.C. next testified that appellant touched her private part "the same way" "a lot of times," "a bunch of times," and "every time" she visited him. She stated that she visited a lot of times. The frequency of her visits was corroborated by appellant and his wife, who testified that their granddaughters were at their home "all the time" and "almost on a daily basis."

The testimony adequately describes the number of acts committed with sufficient certainty to support a finding that at least three lewd and lascivious acts occurred. The specificity requirement is met by a child victim who gives a "general time period" and describes a sufficiently certain number of acts, such as "every time we went camping" or "twice a month." (*People v. Jones, supra,* 51 Cal.3d at p. 316.) The jury could reasonably infer that "a lot" or "a bunch" of molestations were more than three, particularly if it occurred "every time" A.C. visited appellant, which was on an almost daily basis.

The jury believed A.C. Her youth is not a disqualifying factor. Even if her performance as a witness was different from an adult, "that does not mean that a child is any more or less credible a witness than an adult." (§ 1127f; *People v. Jones, supra,* 51 Cal.3d at pp. 315–316.) We cannot say, on this record, that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support" ' " a conviction for continuous

14

sexual abuse of a child. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### 2. *Uncharged Sexual Offenses With Siblings*

Appellant asserts that the court improperly allowed his sisters to testify that he molested them in their childhood. He claims prejudice because the incidents "were more egregious than the charged offenses, were remote in time," and make him "appear to be life-long pedophile who preyed on family." The court has broad discretion to admit or exclude evidence of prior sex offenses, which are " ' "particularly probative" ' " in sex crime prosecutions. (*People v. Loy* (2011) 52 Cal.4th 46, 61.) The ruling will stand unless it is arbitrary, whimsical, or capricious as a matter of law. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

Evidence Code section 1108 allows evidence of other sexual offenses unless the court, in its discretion, determines that its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice, confuse the issues, or mislead the jury under Evidence Code section 352. The court weighed the prejudice to appellant and found the evidence admissible. It is undisputed that the evidence involved sex offenses. (Evid. Code, § 1108, subd. (d)(1).)

Evidence Code section 1108 "expand[s] the admissibility of disposition or propensity evidence in sex offense cases" to "assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.) The evidence "may be helpful to the jury on a commonsense basis, for resolution of any issue in the case, including the probability or improbability that the defendant has been falsely accused."

15

(*People v. Robertson, supra,* 208 Cal.App.4th at p. 990; *People v. Ranlet* (2016) 1 Cal.App.5th 363, 374.)

Appellant argues that the uncharged sex crime evidence is inadmissible because it is (1) dissimilar to the charged crimes; (2) inflammatory; (3) stale; (4) distracted the jury from the charged crimes; and (5) consumed undue time. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.) We disagree.

The crimes were similar in nature. In the charged and uncharged incidents, appellant molested female relatives of similar age at home, often with other family members nearby. (*People v. Cordova* (2015) 62 Cal.4th 104, 134 [propensity may be inferred from sex offenses against young children at home]; *People v. Hernandez* (2011) 200 Cal.App.4th 953, 966–967 [charged and uncharged offenses against young female relatives].) Unlike molesting a random child at a park who might scream or fight off a stranger, appellant abused vulnerable, trusting relatives, who were frightened and unsure how to react. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41 ["pattern of molesting his young female relatives" for decades].) By instilling fear, appellant could rely on their silence.

Appellant's commission of more egregious acts with his sisters is not disqualifying. (*People v. Loy, supra,* 52 Cal.4th at p. 63 [it is enough that the charged and uncharged acts be sex offenses].) " 'Many sex offenders are not 'specialists' and commit a variety of offenses which differ in specific character.' " (*People v. Soto* (1998) 64 Cal.App.4th 966, 984.) The evidence was not prejudicial because of its strength. The prejudice that the courts guard against comes from evidence that evokes bias against the defendant while having little effect on the issues. (*People v. Karis*

16

(1988) 46 Cal.3d 612, 638 [" ' "prejudicial" is not synonymous with "damaging" ' "].)

The evidence supported an inference of appellant's propensity to molest close relatives. Because he testified that the current victims are untruthful, propensity evidence is particularly relevant to his and the victims' credibility. It remains relevant despite the 30-year gap between appellant's abuse of his sisters and his abuse of his granddaughters. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1099 [no specific time limit exists that makes an uncharged offense so remote as to be excludable].) The passage of time affects the weight of the prior acts, not their admissibility. (*People v. Hernandez, supra,* 200 Cal.App.4th at p. 968 [40 years from the first offense against a daughter to the last offense against a granddaughter].) Moreover, the similarities in his behavior " 'balanced out the remoteness.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 285.) Appellant's sexual interest in young girls persisted despite the passage of time.

The evidence would not confuse the jury. The jury was instructed that an uncharged offense (1) "is not sufficient by itself" to prove appellant is guilty of the charged offenses, which the People must prove beyond a reasonable doubt, and (2) can be considered "for the limited purpose of determining the defendant's credibility." We must presume the jury followed the limiting instruction. (*People v. Ervine* (2009) 47 Cal.4th 745, 776.) The instruction removed the risk appellant would be punished for his past behavior with his sisters. (*People v. Anderson* (2012) 208 Cal.App.4th 851, 895–896.) The sisters' testimony did not consume undue time. (*People v. Frazier, supra,* 89 Cal.App.4th at p. 42 [uncharged offense evidence from three

17

witnesses did not dwarf the trial].)  The court did not abuse its discretion by admitting uncharged crime evidence.

### 3.  *Admission of Domestic Violence Testimony*

Appellant contends that the prosecutor improperly elicited testimony about appellant's domestic violence against his wife. Defense counsel never objected as the prosecutor asked witnesses about domestic abuse.  Appellant asserts that his attorney's failure to object amounted to ineffective assistance of counsel.

Appellant mischaracterizes the issue as one of prosecutorial misconduct.  Misconduct occurs when a prosecutor intentionally elicits testimony that violates a court order; however, " 'merely eliciting evidence is not misconduct.  Defendant's real argument is that the evidence was inadmissible.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 379–380.)  Here, there is no court order barring questions about domestic abuse.

To preserve his claim of inadmissibility, appellant had to object to questions about domestic violence.  His failure to object forfeited review.  (*People v. Scott* (1997) 15 Cal.4th 1188, 1218.) The trial court had no sua sponte duty to remedy misconduct or exclude testimony that appellant belatedly deems objectionable on appeal.  (*People v. Medina* (1995) 11 Cal.4th 694, 727.)

Defense counsel's failure to object was not prejudicially deficient performance falling below an objective standard of reasonableness.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–692.)  Counsel exercised "reasonable professional judgment" (*id.* at p. 690) and realized that the prosecutor's questions were a permissible attack on the credibility of defense witness Ofelia Pimentel, who implied that the victims lied because appellant was never alone with them.  She was then asked if appellant ever beat or abused her or left her on a freeway; she denied it.

18

Although instances of misconduct are inadmissible to prove the conduct of a person on a specified occasion, they can be used to attack the credibility of a witness.  (Evid. Code, § 1101, subd. (c).)  "Evidentiary limitations on the use of evidence of specific instances of prior misconduct . . . do not apply to evidence offered to support or attack the credibility of a witness."  (*People v. Kennedy* (2005) 36 Cal.4th 595, 620.)  "Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it has a tendency in reason to disprove the truthfulness of the witness's testimony."  (*People v. Hawthorne* (2009) 46 Cal.4th 67, 99.)

After Mrs. Pimentel denied being abused, appellant's sister A.P. testified on rebuttal that Mrs. Pimentel blamed appellant for hitting her and bruising her eye; she showed where he choked her neck, and he left her at night on a freeway.  A.P. saw Mrs. Pimentel's injuries and offered to help her escape appellant and return to Mexico.  Appellant's daughter E.M. testified that appellant choked and was "always verbally abusive" to her mother and even drove the wrong way on a freeway while asking Mrs. Pimentel if she wanted to die.

The prosecutor's questions about appellant's abuse had a tendency in reason to undermine Mrs. Pimentel's testimony that they have a "very good relationship" and appellant is "very loving."  The jury could deduce that she is so fearful of appellant that she lied for him by saying she never left him alone with their granddaughters.

If a defense witness claims a good domestic relationship with a defendant, the prosecutor may test that assertion by asking about the defendant's abuse, to attack the witness's credibility.  (*People v. Guthreau* (1980) 102 Cal.App.3d 436, 445;

19

*People v. Case* (2018) 5 Cal.5th 1, 31 [eliciting evidence to show a witness "had reason to fear defendant"].)  It also casts doubt on appellant's testimony:  If the jury believed the testimony that appellant harmed his wife, after he denied ever doing so, it undermined the credibility of his claim that he was never alone with or molested the victims.

### 4.  *Questions About the Victims "Lying"*

Appellant contends that the prosecutor engaged in misconduct by asking him on cross-examination whether the victims lied.  The prosecutor asked appellant if "everything that [L.C.] said was a lie?" and "[S.C.] testified that you touched her more than once.  And you're saying that what she testified to is not true?" and "[S.M.] testified live as to what and how you touched her on three different occasions; correct?  And . . . you're saying that what she testified to is not true?" and "testimony from [A.C.] is not true?"  Appellant replied that "these things did not happen" and their testimony is "not true."

Defense counsel did not object to the questions addressed to appellant about the victims' honesty.  " 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition.' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.)  "We need not address [appellant's contentions] on the merits because defense counsel's failure to object to the prosecutor's [questions] waives the issue on appeal." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125.)

In any event, "the prosecutor's 'was [s]he lying' question did not constitute misconduct" because the questioning did not intentionally elicit inadmissible testimony, and did not berate appellant or attempt to inflame the passions of the jury.  (*People v. Hawthorne, supra,* 46 Cal.4th at p. 98.)  "Were they lying"

questions are evaluated "in context" to determine if they are argumentative, or designed to elicit irrelevant or speculative testimony. (*People v. Chatman, supra,* 38 Cal.4th at p. 384.) Such questions are permissible "if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Ibid.*; *People v. Riggs* (2008) 44 Cal.4th 248, 318 [defendant had personal knowledge whether he abused witnesses and he could be asked if they were lying].)

Here, appellant opened the door on direct examination by repeatedly testifying that his sisters' testimony was "not true" and his granddaughters described molestations that "did not happen." The prosecutor pursued *more testimony* on something appellant *already suggested* on direct examination, i.e., that the victims were untruthful. The follow-up questions to appellant's direct testimony, seen in this context, were permissible because appellant claimed personal knowledge about his accusers' veracity. Indeed, appellant gave identical answers on direct and on cross-examination about the supposed fallaciousness of the witnesses' testimony.

Defense counsel's failure to object did not constitute ineffective assistance. Counsel's representation did not fall below an objective standard of reasonableness and there is no reasonable probability that a determination more favorable to appellant would have resulted. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1126.) No objectionable conduct occurred when the prosecutor asked appellant to amplify his assertion that his accusers were untruthful.

### 5. *Allowing Rebuttal Witnesses in the Courtroom*

Appellant argues that the prosecutor violated a court order excluding witnesses by allowing A.P. (appellant's sister) and E.M. (appellant's daughter) to stay in the courtroom and listen to appellant's wife Ofelia testify. A.P. and E.M. later gave testimony refuting Ofelia on rebuttal. Appellant forfeited the claim by failing to object to the witnesses' presence or moving to exclude or strike their testimony. (*People v. Young* (1985) 175 Cal.App.3d 537, 543.)

Appellant claims ineffective assistance of counsel, but we see no prejudice to him. It is true rebuttal witnesses heard Mrs. Pimentel testify that appellant did not engage in domestic abuse. However, even if counsel had objected and the witnesses had left the courtroom, they still would have been asked on rebuttal about their personal knowledge of Mrs. Pimentel's physical and verbal abuse by appellant. And E.M. would have refuted defense testimony by saying she left her children alone with appellant twice a week while she took Mrs. Pimentel for errands. Thus, counsel's failure to object was immaterial. There is no reasonable probability a determination more favorable to appellant would have resulted. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1126.)

### 6. *The Multiple Victim Circumstance*

Appellant challenges his sentence because the jury was not given a verdict form to find multiple victims. The One Strike law applies to a defendant who is convicted of committing lewd or lascivious acts "against more than one victim." (§ 667.61, subds. (c)(4), (e)(4).) If the trier of fact finds section 288 violations against multiple children under age 14, the prison term is 25 years to life as to "each victim attacked on each separate

22

occasion." (§ 667.61, subds. (j)(2), (o); *People v. Wutzke* (2002) 28 Cal.4th 923, 931.)

Appellant was charged with violating section 667.61 as to all counts, placing him on notice that the court would use the One Strike law at sentencing. This case is thus distinguishable from *People v. Mancebo* (2002) 27 Cal.4th 735, 745, in which "the information neither alleged multiple victim circumstances nor referenced . . . section 667.61 in connection with" felony sexual offenses against different victims.

At sentencing, the court acknowledged that appellant was charged with violating section 667.61 but the jury was not given the verdict form for it. The court deemed this "harmless error given the circumstances. When the jury has, in fact, found the defendant guilty of committing the specified crimes against multiple victims, it is considered harmless error to not give an instruction specifically and have the jury make a finding on the multiple victim allegation." We agree.

The jury makes the multiple victim finding after it returns convictions on offenses involving more than one victim. (*People v. Carbajal* (2013) 56 Cal.4th 521, 535.) The court has a duty to instruct on the elements of the One Strike circumstance. (*People v. Jones* (1997) 58 Cal.App.4th 693, 709.) It did not do so here.

The instructional error "was harmless beyond a reasonable doubt because the jury necessarily resolved the factual question posed by the omitted instructions adversely to defendant." (*People v. Jones, supra,* 58 Cal.App.4th at p. 709.) "Here, it is clear the jury intended to find each multiple victim circumstance true. It made such findings to the best of its ability, with the verdict forms it had been given" by making separate findings as to each victim. (*Id.* at p. 711.) By analogy, the court errs by

removing from the jury's consideration a multiple murder special circumstance; however, the error is "undoubtedly harmless" because the jury convicted the defendant of three counts of first degree murder.  (*People v. Marshall* (1996) 13 Cal.4th 799, 852.)

Though the court did not provide a verdict form on section 667.61, the jury found that appellant violated section 288 nine times, committing lewd and lascivious conduct on four children under the age of 14.  It necessarily follows that the facts needed to apply the sentencing rules in section 667.61 were established by proof beyond a reasonable doubt.  (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.